Andrea L. Cook, SBN 164915
**ANDREA COOK & ASSOCIATES**
555 East Ocean Boulevard, Suite 430
Long Beach, California 90802
Telephone: (562) 951-9135
Facsimile:   (562) 951-9126
E-mail:  alcook@alcooklaw.com

Attorneys for PLAINTIFF
ERIC ALDAPE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC ALDAPE,<br><br>        Plaintiff,<br><br>v.<br><br>International Longshore and Warehouse Union; Local 13 and, DOES 1 through 50, inclusive,<br><br>        Defendants | CASE NO. 2:18-cv-00624<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**1.  BREACH OF THE DUTY OF FAIR REPRESENTATION; and**<br>**2.  BREACH OF CONTRACT**<br><br>**REQUEST FOR JURY TRIAL** |

Plaintiff, Eric Aldape, hereby asserts the following allegations:

## INTRODUCTION and PARTIES

1.     Eric Aldape (hereinafter "Aldape" or "PLAINTIFF") joined the International Longshore and Warehouse Union in July of 1999.  He was and continues to be a dues-paying member and worked without incident until 2009.  At various times throughout his tenure within Local 13, he has held various positions, including that of an ILWU Caucus Delegate.  At all times

1

1   herein mentioned, PLAINTIFF, Eric Aldape, is a citizen of the United States

2   and a resident of Long Beach, County of Los Angeles, State of California.

3        2.      A Defendant in this action is the International Longshore and

4   Warehouse Union (hereinafter, "ILWU").  42,000 strong throughout multiple

5   states, the executive offices for ILWU are located in San Francisco,

6   California.  The ILWU workforce on the West Coast ports employs more

7   than 14,000 workers who receive a compensation package that is among

8   the most lucrative among all blue-collar workers in the United States.  Full-

9   time workers earn an average of $161,000 annually in wages, along with a

10   non-wage benefits package costing more than $100,000 per active worker

11   per year.[1]

12        3.      The ILWU benefits package includes fully paid health care for

13   workers, retirees and their families with no premiums, no in-network

14   deductibles and 100 percent coverage of basic hospital, medical and

15   surgical benefits.  Prescription drugs are covered for $1 per prescription;

16   and, dental and vision care are provided to workers, retirees and their

17   families at little or no cost.  Workers are also eligible for a pension that has

18   seen major upgrades in recent years, with a current maximum benefit of

19   nearly $89,000 per year.  Workers have access to a 401(k) savings plan

20   with an employer contribution, as well as 13 paid holidays each year and up

21   to six weeks of paid vacation.

22        4.      Local 13 is also a Defendant in this action.  Local 13 is located in

23   San Pedro, California.  Local 13 is one of many local divisions of the ILWU

24   which governs the workers in the Long Beach/Los Angeles harbor –

25

26   [1]   The next high paying blue collar job is that of elevator repair and
     construction.  On average they earn $73,560 annually, or $35.37 an hour.
27   The top 10% of them draw in six-figure salaries.  There are few (if any),
28   health and retirement benefits to compare to the ILWU.

1  combined, they are the 16th largest port(s) in the world with respect to

2  tonnage shipped and or received.  (ILWU and Local 13 are hereinafter

3  jointly referred to as the "UNION" or, "DEFENDANT UNION.")

4      5.      Coincident with an increasing interest and activity, including

5  holding certain positions in the governance of DEFENDANT UNION and in

6  the form of the creation and publication of cartoons, writings and

7  outspoken statements by Mr. Aldape regarding the political and day to day

8  running of the UNION, the UNION leadership began to target Mr. Aldape in

9  a campaign of harassment, endless unfounded grievances and

10  indiscriminate and capricious arbitrations with varying outcomes.  These

11  arbitrations occurred over a period of eight years, but eventually ended the

12  career of Mr. Aldape by his permanent deregistration on July 31, 2017.

13      6.      Mr. Aldape was sentenced to deregistration as a result of an

14  arbitration in which (like many others set forth below), the UNION failed to

15  represent him.  The UNION's failure to represent Mr. Aldape is manifested

16  in a number of ways set forth below.

17      7.      As a member of Local 13, Mr. Aldape was subject to a Collective

18  Bargaining Agreement (hereinafter, "CBA"), the Pacific Coast Longshore

19  Contract Document for clerks and related classifications ("PCLCD")

20  (hereinafter, variously referred to as the CBA or PCLCD).  Section 13.1 of

21  the PCLCD prohibits discrimination against union members.  It provides in

22  pertinent part:

23      There shall be no discrimination … either in favor of or against

24      any person because of membership or nonmembership in the

25      Union, activity for or against the Union or absence thereof, race,

26      creed, color, sex (including gender, pregnancy, sexual

27      orientation), age (forty or over), national origin, religious or

28      political beliefs, disability, protected family care or medical leave

3

status, veteran status, political affiliation or marital status.  Also
prohibited by this policy is retaliation of any kind for filing or
supporting a complaint of discrimination or harassment.

8.      The PCLCD requires Union members to submit any grievances
related to their employment to binding arbitration.  Section 13.2 of the
PCLCD provides in pertinent part: "All grievances and *complaints alleging*
*incidents of discrimination or harassment … in connection with any action*
*subject to the terms of this Agreement based on race, creed, color, sex …*
*or alleging retaliation of any kind for filing or supporting a complaint of such*
*discrimination or harassment*, shall be processed solely under the Special
Grievance/Arbitration Procedures For The Resolution of Complaints Re
Discrimination and Harassment Under the Pacific Coast Longshore & Clerk's
Agreement."  (emphasis added)

9.      The cause of Mr. Aldape's deregistration was the failure of
DEFENDANT UNION to fairly and adequately represent him by ratifying and
condoning the misinterpretation of the plain meaning of *Rule* 13.1, by
repeatedly encouraging and urging the misrepresentation of the *Rule* –
causing Mr. Aldape to lose over one year of time off and eventually in
deregistration – a permanent expulsion from working for any member
companies of the *Pacific Maritime Association* (hereinafter "PMA").

10.    PMA is effectively the "employer" for all ILWU workers in the
Long Beach/Los Angeles Harbor.  A handful of companies who are not one
of the thirteen members of PMA continue to utilize ILWU workers – but, this
has not been the case in the Long Beach/Los Angeles harbor(s) for several
years.  When Mr. Aldape was deregistered, it was a prohibition against
working for any of the 13 member companies of PMA – effectively, all of
the available employers in the Long Beach/Los Angeles Ports.

/ / /

4

11.   Mr. Aldape, like many ILWU members comes from a family of longshoremen.  ILWU membership is not easily obtained but once gained, provides a prosperous and secure income for longshoremen and women and their families.

12.   Mr. Aldape's wife is disabled and the ability to replace the family income cannot occur in the absence of his return to work as a longshoremen.

13.   In addition to the actual outcome of the arbitration; i.e., deregistration as a result of the 12th arbitration (of 14) against Mr. Aldape, he contends that there has been an independent breach of the duty of fair representation and breach of contract in connection with the way in which the arbitration was investigated, prepared and handled and, that he was wrongfully terminated.

14.   Mr. Aldape will establish a breach of DEFENDANT UNION's duty of fair representation, by a showing that the conduct of the union was "arbitrary" and in "bad faith."  Arbitrary, as used in Section 12, has been defined to include conduct, which is perfunctory, reckless or indifferent to Mr. Aldape's interests.  The UNION acted in bad faith by the exercise of ill will, hostility and revenge toward Mr. Aldape.

15.   In the grievance context, this standard prohibits a union from processing a grievance in a perfunctory; or in this case, in a manner deliberately intended to mislead and support an interpretation of the CBA, *section* 13 et seq. that was undisputedly erroneous.

16.   In this instance, and as set forth below, the act(s) of omission by the DEFENDANT UNION were so egregious and unfair as to be arbitrary, thus constituting a breach of the duty of fair representation.  There was no rational and proper basis for the UNION's conduct.

/ / /

5

17.   As set forth below – repeatedly, over a period of many years, the UNION utterly and completely remained silent in the face of what was clearly and undisputedly a twisted and specious interpretation of a section the CBA in such a way as to cause Mr. Aldape to be found "guilty" of unfounded grievances.  These findings resulted in fines, penalties and the loss of work; and, eventually, deregistration.  Not once did DEFENDANT UNION come to his defense or clarify the plain meaning of the Rule used to persecute and eventually deregister PLAINTIFF.  Instead, officers of Local 13 and ILWU members who were the subject of Mr. Aldape's criticism for fraud and unlawful conduct, utilized a provision of the PCLCD inapplicable to their complaints, so as to penalize Mr. Aldape and to cause his deregistration.  The UNION failed to represent Mr. Aldape in the full and complete knowledge that the PCLCD was being misused and twisted in such a fashion as to cause him hundreds of thousands of dollars of financial loss, the loss of substantial benefits and eventually, the ability to support his family.

18.   The shame and humiliation of losing a position in what was effectively the "family business" and ultimately costing him a career that was the lynchpin of the support of his family, including the education of his children, the security of adequate medical, dental and eye care and a secure retirement that he worked years to secure, has been insufferable for Mr. Aldape and for his family.

19.   The grounds urged by the UNION to support its disciplinary action may have appeared to have had a semblance of lawfulness but the true motivation for the action was unlawful, arbitrary and a purposeful misuse of the CBA/PCLCD.

/ / /

/ / /

**JURISDICTION & VENUE**

20.     This is an action for money damages in excess of $75,000 brought pursuant to the *Labor Management Relations Act* (LMRA) § 301 (29 U.S.C. § 185).  Jurisdiction of this court is invoked under 28 *U.S.C. §§* 1931 & 1341, (2), (3) & (4), 1343(a)(3)(4), and the aforementioned statute; PLAINTIFF further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.

21.     The acts and omissions complained of herein arose within the County of Los Angeles at the office of the ILWU located in San Pedro, California, the executive offices of the ILWU located in San Francisco, California and at such location as the arbitration of Complaint SPSC-0006-2017 (the subject of this lawsuit), was held at the Pacific Maritime Association, 1 World Trade Center, Suite 1700, Long Beach, California. Therefore, venue is proper before this Court.

22.     The acts/omissions complained of herein began sometime in or about 2009 and have continued to the present.  The relevant arbitration and the subject of this lawsuit was filed on March 10, 2017 and decided on July 10, 2017.  The matter was taken up on appeal and the appeal confirmed the arbitrator's award on July 31, 2017.  Two other arbitrations were decided after the decision and appeal were final regarding Plaintiff's deregistration.

23.     PLAINTIFF is informed and believes and thereon alleges that at all times relevant herein, each DEFENDANT was and is the agent, servant, employee, partner, joint venturer, assistant, supervisor, consultants of each and every other DEFENDANT, and as such was at all times acting within the course, purpose, scope, and authority of said agency, partnership, and employment, and acting with the express or implied knowledge, permission, / / /

authority, approval and consent of every other named and unnamed DEFENDANT.

24.    PLAINTIFF is informed and believes and thereon alleges that the true names and official capacities of DEFENDANTS designated as DOES 1-50, inclusive, are unknown to PLAINTIFF, who therefore sues these DEFENDANTS by such fictitious names.  PLAINTIFF will seek leave of Court to amend his complaint to show the true names and capacities of these DEFENDANTS when they have been ascertained.

25.    All of the DEFENDANTS are sued in their individual and official capacities.

26.    PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS, including DOES 1-50, as employees and agents of ILWU and Local 13, have a responsibility either for making policy or for implementing and enforcing and defending Mr. Aldape, as required by law and under the terms and conditions of the CBA and to do so in a fair and non-discriminatory manner.

27.    PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS, including DOES 1-50, consciously, willfully, intentionally, knowingly, recklessly, vicariously and/or otherwise tortuously caused the damages proximately thereby to PLAINTIFF as hereinafter alleged, either through DEFENDANTS' own conduct or through the conduct of ILWU and Local 13's agents, servants, partners, joint venturers, and employees, and each of them, or in some other manner.  All actions of each DEFENDANT were ratified and approved by every other DEFENDANT.  PLAINTIFF further alleges on information and belief that all of the actions alleged herein were taken pursuant to the customs, policies, and practices of the management and officers of ILWU and Local 13 during the relevant time period.

/ / /

**FACTS**

28.   Mr. Aldape was active in union activities and was elected to various positions including to the Grievance Committee, Executive Board and was a Caucus Delegate.  He is an outspoken and active critic of union members who engage in conduct he alleges is unlawful, fraudulent or not in the best interests of the UNION.

29.   Mr. Aldape repeatedly published articles, cartoons and flyers which contained caricatures, cartoons and exaggerations of union officials and the political, ethical and financial issues facing the UNION.  Many of these publications placed the UNION and various union members in an unfavorable light.

30.   As a result of his active pursuit of fair political comment on union matters in the form of writings, flyers, cartoons and outspoken language, Mr. Aldape was the subject of 14 grievances over an eight year period.  All were filed under the provisions of 13.2 of the PCLCD/CBA as detailed above.

31.   The CBA mirrors the *California Fair Employment and Housing Act,* (§§ 12900-12907) and *Title VII of the Civil Rights Act* of 1964, in particular, the section(s) dealing with discrimination based on protected classes.  In the case of Mr. Aldape, he was repeatedly charged (mis-charged) under the provisions of 13.2.

32.   Offended by the gross misuse of 13.2, PMA, the employer of DEFENDANTS and a signatory of the CBA, offered a legal opinion to DEFENDANT UNION that their use of 13.2 was being used in an unintended manner according to the intentions of the signers/drafters of the CBA and the plain meaning of the rule.

/ / /

/ / /

9

33.    The November 21, 2012 letter from Richard Marzano, Coast Director, Contract Administration and Arbitration, PMA in reference to Grievance SP-0032-2012 reads in pertinent part:

> Recall the CLRC's February 19, 2002 letter to the Coast Appeals Officer clarifying Section 13.2's procedures.  In it, the Committee clearly stated, by quoting from Section 13.2, that Section 13.2 is limited to claims "alleging discrimination or harassment (including hostile work environment) in connection with any actions subject to this Agreement based on [1] race, [2] creed, [3] color, [4] sex (including gender, pregnancy, sexual orientation), [5] age (forty or over), [6] national origin, or [7] religious or political beliefs, or [8] or alleging retaliation of any kind for filing or supporting a complaint of such discrimination or harassment."  If Section 13.2 is limited to claims alleging discrimination or harassment on at least one of the 8 listed bases, then findings of violations of Section 13.2 and discipline imposed under Section 13.2 must require findings of discrimination or harassment on a least one of the 8 listed bases.  The Area Arbitrator's decision fails to mention discrimination or harassment on any of those bases.

## SUMMARY OF GRIEVANCES

34.    Grievance SP-0005-2009 was filed on September 9, 2009 by Marguarite Droege (Jurisic) which included allegations that Mr. Aldape was circulating a flyer accusing her of a failed drug test which was then "covered up" by her father.  Ms. Droege is the daughter of Mark Jurisic, an ILWU member, elected to the position on the Executive Board and Business Agent.  "Now my reputation has been smeared and I am humiliated."  Ms. Droege goes on to say that she is being "harassed" by virtue of a drug test

which was failed and disclosed.  There is no allegation of harassment as intended by 13.2.  The decision was tendered on October 5, 2009 and the arbitrator found each of Aldape's flyers to be in violation of 13.2 policy.   "*It is a violation to print and distribute printed material that depicts a person's personal being in a derogatory manner*... Mr. Eric Aldape is found guilty [by Arbitrator David Miller] of violating Section 13.2 policy."  Mr. Aldape was assessed thirty (30) days off and ordered to attend "diversity training."  Clearly, 13.2 was inapplicable.  A "derogatory depiction," without being tied to a *protected* class, is a gross misapplication of the Rule.  The matter was appealed and upheld.

35.    Grievance SP-0010-2009 was filed on October 2, 2009 by Steven M. Bebich.  Mr. Bebich was elected to the Executive Board, was a dispatcher and Caucus Delegate.  "*Mr. Aldape has distributed fliers about me during the elections of this year.  However this time he went too far, he threatened to reveal what he alleges to be my criminal history to the membership.*"  "Mr. Eric Aldape is found guilty of violating Section 13.2 Policy...and sentenced to 60 days off all work."  This was a finding by Arbitrator David Miller.

36.    Grievance SP-0002-2010 was filed on March 6, 2010 by Mark Jurisic who accused Mr. Aldape of *throwing a flyer at him (Jurisic) and telling him to take it to his "daddy."*  In this instance, the arbitrator found that the "...grievance does not meet the criteria of a 13.2 violation."  This was a finding by Arbitrator David Miller.

37.    Grievance SP-0026-2011 was filed on July 28, 2011 by Mike Bebich who complained that Mr. Aldape distributed political flyers "*... in retaliation of my political beliefs because I was scheduled to testify against Mr. Aldape in an NLRB Court Hearing.*"  He claims Mr. Aldape "*...is engaging in harassment and intimidation by inviting the membership to attend an*

*NLRB Court Hearing.*"  In an August 8, 2011 letter, Arbitrator Miller writes the, "grievance does not meet the criteria of a 13.2 violation."

38.   Grievance SP-0027-2011 was filed by Mark Jurisic on July 26, 2011 and *accused Mr. Aldape of distributing a flier that "stated the union was spending its money to protect "their buddies and their buddies casual kid.*"  In a letter dated August 8, 2011, Arbitrator Miller found the "grievance does not meet the criteria of a 13.2 violation."

39.   Grievance SP-0032-2012 was filed on September 28, 2012 by Christopher Viramontes, the Secretary/Treasurer of Local 13 at the time. Mr. Viramontes was a powerful person in Local 13 and held positions on the Executive Board, was a Caucus Delegate, and President of Local 13.  He claims, "*Brother Aldape printed false statements to try and influence members during longshore elections which took place from September 25-27, 2012.  What is even more offensive is the cartoon he drew on the back of his flyer.  He drew a picture of me in a nurse's uniform wearing a nurse's cap with the initials P + M on the hat.*"  Mr. Viramontes was under investigation for medical fraud.  There was a letter from PMA asking that the grievance be dismissed and the inapplicability of Section 13.2 to such allegations.  Mr. Aldape was found guilty of violating Section 13.2 policy and assessed 180 days off work by Arbitrator Miller and after appeal, Coast Appeals Officer, Rudy Rubio assessed an *additional* 180 days off suspended. There were no allegations that Mr. Viramontes was being harassed or discriminated against as a result of being under the aegis of a protected class.

40.   Grievance SP-0017-2013 was filed on July 3, 2013 by Christopher Viramontes who complains that Eric Aldape *committed an act of retaliation by physically assaulting Viramontes on July 3, 2013, in close proximity to the Local 13 business office located at 630 S. Centre Street,*

*San Pedro, California because of a past Section 13.2 complaint (SCGM-0009-2012).*   Mr. Aldape was found guilty of retaliation by assaulting Mr. Viramontes and sentenced to 540 days off by Arbitrator David Miller.  Mr. Aldape appealed the decision and his appeal was denied.  Presumably, this retaliation was for the unfounded decision in September, 2012, nearly one year after the purported finding that a cartoon implicating Viramontes in medical fraud was a violation of 13.2.  Nexus in time is a critical consideration in a determination of claims of retaliation.

41.    Grievance SPSC-0005-2016 was filed on March 14, 2016 by Lawrence Toledo who complained that *Eric Aldape violated the 13.2 policy in retaliation for Toledo's participation in a 13.2 hearing that occurred in March 8, 2016, based on a flyer with drawings of rats and an internet posting.*  Mr. Toledo was elected to the grievance committee.  Mr. Toledo did not show up at the March 24, 2016 hearing and the arbitrator dismissed the case.  Mr. Toledo then filed an appeal of the dismissal, the dismissal was reversed and a hearing was scheduled for May 13, 2016.  Mr. Aldape was found not guilty by Arbitrator Mark Mascola.

42.    Grievance SPSC-0008-2016 was filed on March 18, 2016 by *John William Seixas who complained that Aldape violated the Section 13.2 policy based on a flyer with drawings of rats*.  Seixas claims the image is anti-Semitic and is in relation to his Jewish ancestry.  Mr. Seixas was a member of the grievance committee.  The flyer was released the same day another grievance was posted on the internet.  Seixas indicates he does not feel safe either coming or going from the dispatch hall, worksite or his own home.  Mr. Aldape was found not guilty by Arbitrator Mark Mascola.

43.    Grievance SPSC-0032-2016 was filed on August 28, 2016 by John Seixas.  *His complaint involves political cartoon flyers made by Mr. Aldape that were posted, removed, but then reposted by Mr. Aldape.  Mr.*

13

*Seixas claims that Mr. Aldape physically assaulted him when Mr. Seixas was trying to remove the flyers again.* The arbitrator, on October 5, 2016, initially denied a hearing, but Mr. Seixas appealed that decision and the matter was set for a hearing on October 14, 2016. Mr. Aldape was found guilty of prohibited conducted in violation of Section 13.2 and assessed one year off work; and, required to attend unpaid diversity training, review a training video without pay and agreeing by signature to abide by the policy by Arbitrator Ron Merical. After several appeals, Mr. Aldape was allowed to delay his time off to begin on January 1, 2017.

44. Grievance SPSC-0001-2017 was filed on February 6, 2017 by John Seixas claiming retaliation under Section 13.2 in that Aldape continues to work in violation of the arbitrator's ruling and Aldape is breaking confidentiality by allegedly posting about the proceedings on the internet. A hearing under Section 13.2 was denied by Arbitrator Merical, but appealed by Mr. Seixas. The decision was reversed only as to the internet postings. At the April 3, 2017 arbitration, Mr. Aldape was found not guilty by Arbitrator Ron Merical.

45. Grievance SPSC-0006-2017, at issue in the instant matter and resulting in the deregistration of Mr. Aldape, was filed on March 10, 2017 by Christopher Viramontes. *Mr. Viramontes claims Mr. Aldape posted a complaint by PMA against Mr. Viramontes on the internet <u>in retaliation for complaints filed by Mr. Viramontes against Mr. Aldape</u>, which has caused a hostile work environment.* (emphasis added) The Complaint in question was a matter of public record and NOT a confidential document. The Complaint by PMA accused Mr. Viramontes of defrauding the ILWU Benefits Plan through a business, Port Medical. Port Medical representatives were paying ILWU members to bill for false claims and fabricating billing records. Cohorts of Mr. Viramontes were similarly accused and subsequently

convicted of fraud.  The Complaint against Mr. Viramontes was available to anyone in the UNION and was not confidential.

46.    The Complaint by Viramontes against Mr. Aldape made no mention of any protected class.  Mr. Viramontes wrote that: "As a result of this complaint being posted on the website, a very hostile work environment has taken place for me on the job.  I've had members say volatile things to me on the job, phone calls and even other family members who work as longshoreman or Clerks have been questioned."  It is understandable that Mr. Viramontes, accused of defrauding his fellow union members by his employer, would experience the ire of union members.  The last "act" of Mr. Aldape found "guilty" of was in September, 2012 as regards to Mr. Viramontes. Four years is a distant nexus from posting the PMA fraud allegations in 2017 such to substantiate a claim of retaliation.

47.    Arbitrator Mark Mascola based the deregistration of Mr. Aldape not only on Grievance SPSC-0006-2017, but on prior and equally misguided decisions.  "*Past 13.2 hearings involving Aldape provide unmistakable precedent that Aldape has knowledge and awareness of the guidelines, penalties, and wording within the Pacific Coast Special Grievance Handbook.*"  Clearly, the arbitrator had no such knowledge or understanding.

48.    There were no allegations based on race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, or religious or political beliefs, or alleging retaliation supporting a complaint of discrimination or harassment.  Nonetheless, Mr. Aldape was found guilty of Section 13.2 and deregistered.  Mr. Aldape appealed the decision, but the decision was affirmed on July 31, 2017 by Coast Appeals Officer, Larry Schwerin.

49.   In addition to the incorrect decisions, the arbitration proceedings were rife with procedural errors.  Evidence was not admitted and critical testimony was not taken.  The Arbitrator, a dues-paying union member, Mark Mascola, was a known enemy of Mr. Aldape who had assaulted him and threatened to kill the PLAINTIFF in the presence of several individuals.  This was considered on appeal and was of no moment.

50.   Grievance SPSC-0011-2017 was filed on March 23, 2017 by Lawrence Toledo who claimed text messages from Eric Aldape were based on his race and religion and in retaliation for a complaint Mr. Toledo filed against Mr. Aldape.  Mr. Toledo also claims that Mr. Aldape posted articles on the internet attacking him as another form of retaliation.  Mr. Aldape was found not guilty of retaliation as the Arbitrator indicates the correspondence was mutual and outside of the workplace.

51.   Grievance SPSC-0013-2017 was filed on March 29, 2017 by John Seixas who claimed Mr. Aldape was breaking the confidentiality clause with his flyer entitled "Free Speech We Must Preach," alleged harassment (talking over him) at a JPLRC meeting and a flyer entitled "Two BA's for the price of one," which Mr. Seixas believes is threatening.  Mr. Aldape was found not guilty of prohibited conduct in violation of Section 13.2.

## FIRST CAUSE OF ACTION
## BREACH OF THE DUTY REPRESENTATION
## LABOR MANAGEMENT RELATIONS ACT (LMRA) § 301
## (29 U.S.C. § 185)

[Against All Defendants]

52.   PLAINTIFF realleges and incorporates by reference paragraphs 1 through 51 of this Complaint inclusive of this paragraph as though said paragraphs were fully set forth herein.

/ / /

53. Eric Aldape was effectively discharged from employment by deregistering him from working for PMA.

54. The discharge was without just cause as a result of the application (or mis-application) of provisions of the CBA.

55. The UNION breached its duty to fairly represent the PLAINTIFF's interests under the collective bargaining agreement. They engaged in conduct deliberately intended to prevent Mr. Aldape from retaining a valuable and irreplaceable job. Additionally, the UNION engaged in arbitration practices which were not in accordance with designated procedures which were intended to and did rob Mr. Aldape of procedural due process.

56. There was no just cause under the law. The allegations against Mr. Aldape were falsified and he was wrongly charged. The Cause articulated by DEFENDANTS, "violation of 13.2" is an arbitrary and capricious justification. DEFENDANTS acted in bad faith and in a manner that no reasonable union would behave.

57. In the instant matter, the UNION exercised its considerable discretion to twist and misuse the CBA so as to breach their duty of fair representation and acted in bad faith and in an arbitrary and discriminatory manner and then failed to process the grievance in a manner intended to protect the rights of Mr. Aldape. The Arbitrator was a known enemy of Mr. Aldape who had assaulted him and threatened to kill the PLAINTIFF in the presence of several individuals. Yet, this was the arbitrator assigned to and responsible for the deregistration of Mr. Aldape. When considered on appeal, the issue of bias on the part of the arbitrator was considered to be of no moment.

///

///

17

58.    DEFENDANTS acted in "bad faith."  There is substantial evidence of fraud, deceitful action, and dishonest conduct on the part of DEFENDANT UNION.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
[Against Defendants]

59.    PLAINTIFF realleges and incorporates by reference paragraphs 1 through 58 of this Complaint inclusive of this paragraph as though said paragraphs were fully set forth herein.

60.    During the course of PLAINTIFF's membership, PLAINTIFF's bargaining representative, LOCAL 13, was party to a Collective Bargaining Agreement with PMA which provided certain terms and conditions of employment governing certain ILWU employees.  As a member of LOCAL 13 and an employee of PMA, PLAINTIFF's employment was covered by the CBA.

61.    From 2009 to 2017, the UNION used the CBA and its collective powers to persecute Mr. Aldape and to violate the agreements under the CBA – such that Mr. Aldape lost more than one year of time and eventually was deregistered.

62.    The violation of the CBA constitutes a breach of the collective bargaining agreement between Mr. Aldape a member of DEFENDANT UNION and PMA.

63.    As a result of DEFENDANT's breach of contract, PLAINTIFF has lost income, promotion possibilities and other valuable job rights.

## PRAYER

Wherefore, PLAINTIFF seeks judgment against DEFENDANTS:

1.    For general damages in accordance to proof;

2.    For special damages according to proof;

3.    For punitive and exemplary damages according to proof;

4.    For attorney's fees and costs;

5.    For costs of suit; and,

6.    For such other and further relief as the court may deem proper.


Dated:  January 24, 2018         ANDREA COOK & ASSOCIATES


By:  _____/s/_____

Andrea L. Cook
Attorneys for Plaintiff
ERIC ALDAPE


## REQUEST FOR JURY TRIAL

Plaintiff ERIC ALDAPE hereby requests a jury trial in this matter.


Dated:  January 24, 2018         ANDREA COOK & ASSOCIATES


By:  _____/s/_____

Andrea L. Cook
Attorneys for Plaintiff
ERIC ALDAPE